IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   C.A. NO. 08  4711 |
| | ) |
| HOME CARE HOSPICE, INC. , | )   **FILED UNDER SEAL** |
| ALEX PUGMAN, MATVEI KOLODECH, | ) |
| MALVINA YAKOBASHVILI AND | ) |
| SVETLANA GANETSKY | ) |
| | ) |
|     Defendants. | ) |

FILED

SEP 30 2008

_____ Clerk

## VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The United States of America, by its attorneys, Laurie Magid, Acting United States Attorney and Colin Cherico and Eric Gill, Assistant United States Attorneys, brings this civil action under the Anti-Fraud Injunction Statute, 18 U.S.C. § 1345. In support of its Verified Complaint, the United States respectfully alleges as follows:

1.    This is a civil action brought by the United States to enjoin defendants Home Care Hospice, Alex Pugman, Matvei Kolodech, Malvina Yakobashvili and Svetlana Ganetsky from continuing their ongoing fraud against the Medicare Program and to prevent Defendants from dissipating assets they have accumulated as a result of this fraud.

2.    Defendants are a hospice agency and its principals who provide care for terminally ill patients. Defendants systematically defrauded Medicare by submitting false claims seeking payment for (1) services never performed on Home Care Hospice's patients and (2) services provided to patients for which they were, in fact, not eligible. Defendants further

1

defrauded Medicare by falsifying patient records in order to support their false claims.

Defendants' fraud has tainted a substantial portion of the more than $46 million HCH has

received from the Medicare program between 2003 and June 2008.

## JURISDICTION AND VENUE

3.    This complaint is brought by the United States for a temporary restraining order

and preliminary injunction and other equitable relief pursuant to 18 U.S.C. § 1345. The action is

brought to enjoin fraud based upon probable cause for violations of the federal wire fraud (18

U.S.C. § 1343) and health care fraud statutes (18 U.S.C. § 1347). Along with other equitable

relief, Plaintiff seeks to enjoin Defendants from transferring, dissipating, concealing,

encumbering, impairing or otherwise disposing of, in any manner, the assets contained in the

bank and brokerage accounts listed in Exhibit "A."

4.    The Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §

1345 and 28 U.S.C. §§ 1331 and 1345.

5.    The Court has personal jurisdiction over defendants and venue is proper in this

District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) as all the defendants reside in this District

and Defendants' action that gave rise to this complaint all occurred in this District.

## PARTIES

6.    Plaintiff is the United States of America. At all times material to this action, the

Department of Health and Human Services ("HHS") was an agency and instrumentality of the

United States and the Centers for Medicare and Medicaid Services ("CMS") was the component

agency of HHS that administers and supervises the Medicare program.

7.    Defendant Home Care Hospice, Inc. ("HCH") is a Pennsylvania corporation

2

with a principal place of business at 2801 Grant Avenue in Philadelphia, Pennsylvania. HCH is the organization through which the individual defendants listed below conducted their fraudulent schemes on the Medicare program.

8.       Defendant Alex Pugman, a.k.a. Aleksandr Pugachevsky ("Pugman"), is a resident of Pennsylvania currently residing at 197 Edwards Drive, Churchville, PA 18966. Pugman serves as HCH's director, and, upon information and belief, he controls HCH's daily operations, including the supervision of care and services, marketing and billing.

9.       Defendant Svetlana Ganetsky, a.k.a. Lana Ganetsky ("Ganetsky"), is a Pennsylvania resident currently residing at 197 Edwards Drive, Churchville, Pennsylvania, 18966. Ganetsky is Pugman's spouse and has held numerous positions at HCH. Ganetsky is involved in all aspects of the business and directs the admission and discharge of patients.

10.       Defendant Matvei Kolodech, a.k.a. Matthew Kolodesh ("Kolodech"), is a Pennsylvania resident currently residing at 193 Edwards Drive, Churchville, PA 18966. Kolodech does not hold a formal staff position at HCH, but is Pugman's business partner in various entities, several of which receive funds derived from defendants' Medicare fraud. Despite lacking a formal position at HCH, Kolodech makes key business and financial decisions that affect HCH operations. Kolodech is the husband of HCH's CEO, Malvina Yakobashvili and he operates a furniture store in the same building as HCH.

11.       Defendant Malvina Yakobashvili ("Yakobashvili"), is a Pennsylvania resident currently residing at 193 Edwards Drive, Churchville, PA 18966. She is the Chief Executive Officer of HCH and is married to Kolodech. HCH, Pugman, Kolodech Ganetsky and Yakobashvili will be referred to throughout this Complaint as "Defendants."

3

## FACTUAL BACKGROUND

12.     Medicare is a federal health insurance program that provides coverage for individuals age 65 or older and for certain disabled individuals. Medicare is financed by federal funds from payroll taxes and premiums paid by beneficiaries.

13.     The Medicare program consists of several parts, one of which is referred to as "Part A", Hospital Insurance. Medicare "Part A" helps pay for hospital, home health episodes, skilled nursing facility care and hospice care. The focus of this complaint is Defendants' submission of fraudulent claims to Medicare for hospice care.

14.     To qualify for hospice care, a Medicare patient must be certified by a physician as terminally ill with a life expectancy of six months or less if the terminal condition runs its normal course. If a patient elects hospice care, she waives all curative medical care related to the terminal diagnosis. 42 C.F.R. § 418.24.

15.     The patient chooses the hospice provider to care for his or her terminal illness. 42 C.F.R. § 418.24. At the end of ninety days, a physician may re-certify a patient for hospice care if the patient remains terminally ill. 42 C.F.R. § 418.21.

16.     Medicare recognizes four levels of hospice care. 42 C.F.R. § 418.302. The following three levels of care are relevant to the allegations set forth in this Complaint:

> a)    **Routine Care** - Patients received routine care in their own homes or in nursing homes. Patients receiving routine care typically are cared for by registered nurses (RNs), licensed practical nurses (LPNs) and home health aides. The vast majority of hospice patients receive routine care, which providers are reimbursed for by Medicare at approximately $140 per day .

4

b)    **General Inpatient Care** – Hospice agencies use general inpatient care for pain control or acute or chronic symptom management. The inpatient services are short term and must be provided at a Medicare certified facility which is under contract with the hospice agency. 42 C.F.R. § 418.302(b)(4). General inpatient care is reimbursed by Medicare at a payment rate of approximately $600 per day.

c)    **Continuous Care** – Continuous Care is provided at the patient's home, when the patient is experiencing a medical crisis and requires predominantly nursing services to achieve palliation and symptom control. The hospice agency must provide a minimum of eight hours of care within each 24 hour day period. Continuous care is reimbursed by Medicare at a payment rate of approximately $800 per 24 hour day.

17.    Hospice agencies such as HCH submit claims and receive fixed per-diem payments from Medicare, which are meant to cover all hospice related services, including but not limited to, nursing care, aide care, social workers, therapists, spiritual services and bereavement services. The hospice agency submits a claim to Medicare's contractor for each day that a patient is enrolled in hospice care, and is reimbursed from Medicare based upon the level of hospice care claimed to have been provided.[1] The system established to reimburse hospice agencies places heavy reliance on the honesty and integrity of the hospice provider to furnish accurate and

_____

[1] Cahaba is the government contractor which processes claims submitted by HCH for Medicare reimbursement. HCH currently submits claims electronically to Cahaba. After the submission is checked for errors, HCH receives payment via electronic funds transfer to its operating bank account held at Bank of America.

truthful information.

18.     HCH operates as a "for profit" medical care business and receives Medicare,
Medicaid and private insurance reimbursement for providing home care and in-facility care to
purportedly terminally ill patients with life expectancy prognoses of less than six months. HCH
was certified to participate in the Medicare program on June 15, 2000, and quickly grew from
providing hospices services for 15 patients in 2000 to over 300 patients in 2006.

19.     HCH received approximately $46 million from Medicare between 2003 and June
2008. Upon information and belief, from 2003 through 2006, approximately 91% of the revenue
HCH received from hospice billings came from Medicare.

20.     Home Care Hospice assigns field personnel to one of two "teams," designated
as either the "Russian team" or the "English team." This assignment is generally based upon the
language skill of the team members who are assigned to handle patients who speak the same
language. The two teams operate independently and have separate interdisciplinary team
meetings, patient care managers and home health aide coordinators.

21.     The Health Care Fraud Statute, 18 U.S.C. § 1347, prohibits the knowing and
intentional submission of false or fraudulent claims for payment to any health care benefit
program, including Medicare. Upon information and belief, at least 30% of HCH's total hospice
claims to Medicare are fraudulent, totaling $14.3 million of the $46 million the company
received from Medicare between 2003 through June 2008. HCH, at the direction of the
individual Defendants, falsified patient charts, forged documents and back-dated supporting
documentation in order to defraud Medicare in violation of 18 U.S.C. § 1347.

22.     Defendants supported their fraudulent claims in violation of 18 U.S.C. § 1347 by

6

(i) creating false records for patient care that was not rendered, (ii) submitting claims for levels of service that were never actually provided, (iii) billing Medicare at a reimbursement rate higher than allowed under federal law for the services actually provided, (iv) creating false records to justify the level of care billed for even though the patient was ineligible for such care, (v) back-dating hospice revocation requests, and (vi) charging for untrained and unqualified staff as if they were trained and qualified. HCH also falsely certified that its claims were true, correct and complete as is required under the laws and regulations governing Medicare.

23.     HCH defrauded Medicare by manipulating Medicare's method of reimbursing hospice agencies based upon the level of care provided. The fraudulent billing practices HCH engages in primarily involve the following:

> a) **Fraudulent routine care claims:** HCH submits claims for patients on hospice
> care who are not terminally ill. HCH submits claims to Medicare for services at a
> daily rate of approximately $140 per day after HCH medical directors and other
> physicians falsely certify unqualified patients as terminally ill. As an example of
> HCH's fraud with respect to routine care, an inspector from the Pennsylvania
> Department of Health reviewed the charts of 20 patients that HCH had certified as
> being eligible for hospice care. On June 30, 2006, the inspector issued a report stating
> that HCH had inappropriately placed 11 of the 20 patients in hospice care.
>
> b) **Fraudulent general inpatient care claims:** HCH submits claims in which it
> improperly transfers patients from routine care to the higher general inpatient level of
> care and submits claims to Medicare for services at the higher daily rate of
> approximately $600, when the patients do not properly qualify for the general

inpatient level of care, because the patient's symptoms do not require pain control or acute or chronic symptom management, as required for this benefit under 42 CFR § 418.302(b)(4).

c) **Fraudulent continuous care claims:** HCH submits claims to Medicare for a higher level of care ($800 per day), while it only provided services consistent with the routine level of care.

## Evidence of Fraudulent Claims for Routine and General Inpatient Hospice Care

24.     HCH admitted patients to hospice who did not meet the hospice eligibility requirements (i.e., they were not diagnosed with a terminal illness with six months or less to live). Before admitting a patient to its care, a hospice agency must certify that the patient meets the criteria for hospice care. On several occasions when HCH's nurses had decided that patients did not meet the criteria, Pugman overruled these decisions and ordered that the patient be certified by HCH employees as eligible for hospice care. HCH's unlawful conduct of admitting patients to hospice care who do not meet the Medicare requirements for hospice care is ongoing.

25.     HCH told its nurses to backdate and sign forms required for admission to hospice, so that HCH could submit claims for more days of service than actually provided. Upon information and belief, at least 30% of HCH's patients should never have been admitted to hospice care because they did not meet the criteria for eligibility.

26.     HCH also unlawfully submitted Medicare claims seeking payment for the general inpatient level of care to increase its revenues and profits. More precisely, HCH submitted claims to Medicare at the higher reimbursement rate of approximately $600 per day for patients knowing that these patients were either ineligible for general inpatient care and/or were only

8

provided with routine care. Upon information and belief, 30% of HCH's billings to Medicare for general inpatient care were false and should have been billed at the hospice routine care rate.

## Evidence of Fraudulent Claims for Continuous Care

27.     HCH has submitted, and continues to submit, fraudulent claims to Medicare for continuous care services so that it could receive reimbursement at the higher rate of care (approximately $800 per day vs. $140 per day for routine care services). From 2006 through June 2008, HCH received Medicare reimbursement for continuous care services totaling approximately $878,395.

28.     Upon information and belief, as much as 90% of the continuous care claims that HCH submitted were false. In other words, either the patients did not require continuous care under Medicare guidelines (42 CFR § 418.302) or HCH did not provide the amount of care required to receive Medicare reimbursement at the continuous care rate.[2] These submissions violate the requirement that services billed to Medicare must be medically necessary and were, in fact, provided as billed.

29.     The most common fraud HCH committed with respect to continuous care involved HCH nurses who either did not visit the patients as required and/or overstated the hours of care they did provide. As far back as May 2005 (and continuing to this day), Pugman fabricated schedules of visits to patients by nurses and home health aides. HCH nurses and home health aides then fabricated notes to support false claims for continuous care that was never provided. HCH nurses were paid approximately $25 for every hour that they claimed to be providing

---

[2] During 2006, HCH received more than twice the reimbursement for continuous care than the hospice agency receiving the next highest amount of continuous care reimbursement even though HCH cared for 157 fewer beneficiaries.

patients continuous care treatment as recorded in their fabricated nursing notes.

30.     Pugman typically created a false schedule that showed a registered nurse visiting a patient from three to eight hours per day over a two to five day period. The patient, however, was not visited by the nurse for the number of hours listed on Pugman's schedule. Nevertheless, HCH submitted claims for continuous care for all the hours listed on Pugman's false schedule. Pugman included in the claims visits by individuals who were not actually trained as home health aides in violation of Medicare requirements. HCH and Pugman continue this conduct today.

## Other Fraudulent Actions Taken by Defendants

31.     HCH also back-dated documents to fraudulently revoke the hospice eligibility of patients under its care. When a Medicare patient elects hospice care, the patient waives all curative medical care related to the terminal illness. 42 C.F.R. § 418.24. Therefore, if a hospice patient afterwards enters the hospital and receives treatment related to the diagnosis which made him eligible for hospice, the hospice agency must pay the patient's hospital expenses, unless a patient has "revoked" his hospice election. If a patient chooses to revoke the hospice election, the agency discharges the patient and the hospice agency is no longer responsible for the cost of the patient's hospitalization. At various times, HCH management directed the backdating of revocation forms (making it appear that the patient revoked hospice election earlier than she did) so that HCH unlawfully avoided paying for inpatient hospital treatment. Once these patients were discharged from the hospital, HCH often fraudulently re-admitted them to hospice care once HCH would no longer be responsible for the patient's hospital costs. HCH's fraud with respect to revocation of hospice care election is ongoing.

32.     HCH also paid kickbacks to physicians and other healthcare professionals who

10

referred patients to HCH in order to build its business. HCH created compensated positions such as medical director, hospice physician, patient advisory committees and speakers committee for individuals who performed little or no services for these titles. In reality, these positions were created merely to mask kickback payments made in return for professional referrals to HCH's hospice services. Monthly payments to these professionals range from $300 to over $5,000 per doctor.

33.     The individual Defendants conducted money laundering activity to conceal the illegal proceeds of their schemes to defraud Medicare. The individual Defendants opened multiple bank and brokerage accounts through which they passed money derived from their and HCH's fraudulent activities. Defendants also created an elaborate set of privately-held business entities which also received funds derived from Medicare fraud either directly or indirectly from the HCH operating account.

## Medicare Reimbursement to Home Care Hospice Operating Account

34.     After committing health care fraud for which they received millions of dollars in Medicare reimbursement, the Defendants disbursed these funds into multiple business and personal accounts that they controlled. HCH received Medicare reimbursements and the Defendants directed funds from HCH into these various other accounts as described below. Plaintiff seeks an injunction to prevent Defendants from dissipating their ill-gotten gains contained in these multiple accounts listed in Exhibit A, all of which contain funds derived at least in part from Defendants' health care fraud.

35.     All of the Medicare reimbursement HCH received was deposited via electronic funds transfer into its operating account held at Bank of America, account number 004483034007 (the

11

"Operating Account"). The proceeds from Defendants' scheme to defraud Medicare were transferred from the Operating Account to the Defendants' personal and business accounts to conceal the nature and source of the proceeds. The money often passed from the Operating Account through various other "pass-through" accounts controlled by the Defendants before being deposited in the accounts that Plaintiff seeks to freeze so that Defendants might not dissipate the funds obtained as a result of their fraud. A chart showing the flow of these funds from HCH is attached hereto as Exhibit "B."

## Deposit of Funds from the Operating Account to other HCH Accounts

36.    In addition to its Operating Account, HCH established the following accounts which were established with funds derived from Defendants' scheme to defraud Medicare:

| | | | |
|---|---|---|---|
| a. | Merrill Lynch | No.  89004006 | $1,418,176 |
| b. | Royal Bank | No.  100051554 | $98,820 |
| c. | Citizens Bank | No. 6216646641/68 | $98,529 |
| d. | Willow Financial | No. 230076519 | $97,000 |
| e. | Sovereign Bank | No. 322040833 | $97,000 |
| f. | Fulton Financial | No. 99049414 | $97,000 |
| g. | Wachovia | No. 200003121248732 | $95,549 |
| h. | Commerce | No. 368965547 | $99,000 |

As of July 2008, HCH held directly approximately $2.3 million or about 27% of Defendants' total known liquid assets. See Exhibit "C."

## Deposit of Funds From Home Care Hospice to Defendants' Personal Accounts

37.    HCH, at the direction of the individual Defendants, sent money from the Operating

12

Account to personal or joint bank accounts held by Pugman, Kolodech, Ganetsky or Yakobashvili. Upon information and belief, these accounts include at least 15 accounts at 8 different financial institutions. See Exhibits A & B. At times, Defendants' deposited money directly into these accounts from checks drawn on or transfers made from the Operating Account. At other times, Defendants routed the money through various pass-through accounts before ultimately being deposited into these accounts.

38.    Upon information and belief, between approximately March 2002 and September 2007, Pugman received $4,117,463 from the Operating Account via 80 separate checks and direct transfers to other personal accounts he and/or Ganetsky controlled, as well as to other entities that Pugman controlled.

39.    Pugman established the following accounts with funds derived at least in part from Defendants' scheme to defraud Medicare:

| a. Countrywide | No. 9400389798 | $49,690 |
| b. Citizens Bank | No. 6219431018 | $38,686 |

40.    Ganetsky established the following accounts with funds derived at least in part from Defendants' scheme to defraud Medicare:

| a. Countrywide | No. 92201221414 | $ 91,147 |
| b. Willow Financial | No. 2300070731 | $ 88,989 |

41.    Ganetsky and Pugman established the following joint account with funds derived at least in part from Defendants' scheme to defraud Medicare:

| a. Merrill Lynch | No. 89014910/3974 | $ 68,462 |

42.    Upon information and belief, between March 2002 and August 2007, Malvina

13

Yakobashvili received approximately $4,081,493 directly from the HCH Operating Account that she deposited into personal accounts or joint accounts with Kolodech, her spouse.

43.     Yakobashvili established the following accounts with funds derived from Defendants' scheme to defraud Medicare:

| a. Fulton Financial | No. 4008206 | $113,360 |
| b. Fulton Financial | No. 4008205 | $113,360 |
| c. Fulton Financial | No. 4008208 | $56,815 |
| d. Citizens Bank | No. 6209271271 | $19,811 |

44.     Kolodech established the following accounts with funds derived at least in part from Defendants' scheme to defraud Medicare:

| a. Fulton Financial | No. 4008207 | $56,815 |
| b. Citizens Bank | No. 6212123278 | $12,709 |

45.     Yakobashvili and Kolodech have established several joint bank accounts and safe deposit boxes with funds derived at least in part from Defendants' scheme to defraud Medicare. These accounts and deposit boxes include:

| a. Commerce Bank | No. 609087687 | $202,289 |
| b. Firstrust Bank | No. 168351030 | $191,644 |
| c. PNC Bank | No. 3170024202 | $109,128 |
| d. Willow Financial | No. 1401014145 | $ 87,272 |
| e. First Trust Bank | Nos. 401 & 404 | Not available |

## Deposits from HCH to Business Ventures Controlled by Defendants

46.     The individual Defendants, particularly Pugman and Kolodech, are involved in a set

14

of complex limited partnerships, limited liability corporations and corporations through which they deposit funds derived from their fraudulent Medicare schemes. These controlled entities have received large sums directly from the HCH Operating Account. Upon information and believe, HCH paid approximately $3,541,582 directly to limited partnerships, limited liability corporations, and corporations controlled by Pugman, Kolodech and/or Yakobashvili between June 2003 and June 2008. These entities include (i) ABBA Holdings, LLC, (ii) APLG Holdings, LLC, (iii) KP Grant Enterprises, LLC, (iv) KP Grant Enterprises, LP, (v) M & A Enterprises, LLC, (vi) Mattax Properties, LLC, and (vii) MIG Enterprises, Inc. At times, Defendants' deposited money directly into these accounts from checks drawn on or transfers made from the Operating Account. At other times, Defendants routed the money through various pass-through accounts before ultimately being deposited into these accounts.

## APLG Holdings, LLC

47. APLG Holdings, is a Delaware limited liability company with a business address of 2711 Centreville Road, Suite 400 Wilmington, Delaware. Upon information and belief, Defendant Pugman is the sole owner of this entity. APLG Holdings established the following account with funds derived at least in part from Defendants' scheme to defraud Medicare:

| | | | |
|---|---|---|---|
| a. | Merrill Lynch | No. 890-02024 | $ 2,619,729 |
| b. | USR Fed. Credit Union | No. 15712 | $ 86,249 |

These two funds contain approximately 32% of Defendants' total known liquid assets as of June 30, 2008.

48. Illustrative of the manner in which the Defendants used various entities to deposit the proceeds of their ill-gotten gains is APLG Holdings' Merrill Lynch Account No. 890-02024.

15

This account was funded by monies transferred from personal Merrill Lynch accounts owned by Pugman (No. 890-13390) and/or Ganetsky (890-14910/890-13974). Pugman's Merrill Lynch account were funded directly from the HCH Operating Account. For example, between May 2006 and May 2007, Pugman deposited $1,168,351 directly into account No. 890-13990 from the Operating Account. The joint accounts (890-14910/890-13974) were funded by pass-through accounts. Pugman eventually closed out account 890-13390 and transferred the proceeds from this account into account no. 890-02024 owned by APLG Holdings, but controlled solely by him. Pugman transferred a smaller amount from their joint Merrill Lynch account into APLG Holdings' account No. 890-02024.

**ABBA Holdings, LLC**

49.     Kolodech is the sole shareholder of ABBA Holdings, LLC,  a Delaware limited liability company with a business address of 2711 Centreville Road, Suite 400 Wilmington, Delaware. ABBA Holdings, acting through Kolodech, established the following accounts with funds derived at least in part from Defendants' fraudulent schemes:

| | | | |
|---|---|---|---|
| a. | UBS Securities | No. JH-01387 | $725,402 |
| b. | Willow Bank | No. 230007650 | $320,738 |
| c. | Merrill Lynch | No.  890-02026 | $270,000 |
| d. | Commerce Bank | No. 609087688 | $121,433 |
| e. | M&T Bank | No. 15004216742525 | $100,105 |
| f. | Bank of America | No. 9100078923678 | $99,842 |
| g. | Sovereign Bank | No. 322040949 | $98,599 |
| h. | Citizens Bank | No. 6216646757 | $88,255 |

      i.     Bank of America     No. 383002589441     $29,984

Together these accounts contain approximately $1.85 million, or 22% of Defendants' total known liquid assets.

50.     Illustrative of the Defendants' use of various accounts they control to pass along funds derived from healthcare fraud is the funding of ABBA Holdings' account at Willow Financial. This account was opened on January 24, 2008 with a deposit of $320,738. The source of the initial deposit was a transfer from a personal Willow Financial account in the name of Kolodech and Yakobashvili (account No. 353152). The funds from account No. 353152 came primarily from a check drawn on the HCH Operating Account for $59,844 payable to Yakobashvili (3/19/07) and funds transferred from yet another Willow Financial account (No. 324896). Account 324896 had been established in July 2006 with a $90,000 check from the Operating Account to Yakobashvili (7/11/06) and $110,000 from a Fleet Bank account, which had received approximately $850,000 from the HCH Operating Account between 2001-2006. Hence, the money in the ABBA Holdings account can be traced back to direct transfers from the Operating Account.

## KP Grant Enterprises

51.     Pugman and Kolodech are the named officers of KP Grant Enterprises, LLC, which is sole general partner of KP Grant Enterprises, LP (together "KP Grant Enterprises."). KP Grant Enterprises is the owner of the 2801 Grant Avenue, the location of HCH's principal place of business.

52.     HCH paid KP Grant Enterprises, between June 2005 and June 2008, over $2.9 million dollars. Upon information and belief, KP Grant Enterprises has established the following

account with funds at least partly derived from Defendants' fraudulent activities:

    a.    Sovereign Bank    No. 321113500/462    $23,119

## M&A Properties, LLC

53.    Pugman and Yakobashvili created M&A Properties, LLC on or about October 28, 2002 with Pugman as President and Yakobashvili as Vice-President. Between August 2003 and February 2006, HCH paid M&A Properties over $307,000. M&A Properties also received $25,000 each from the personal bank accounts of Pugman and Yakobashvili.

54.    M & A Properties established the following bank account with funds derived at least in part from Defendants' fraudulent schemes.

    a.    Bank of America    No. 9420208036    $31,915

## Mattax Properties, LLC

55.    Pugman and Kolodech created Mattax Properties, LLC, on or about March 26, 2004. HCH paid Mattax Properties over $240,000 from May 2004 to May 2007 directly from its Operating Account.

56.    Mattax Properties established the following account with funds derived at least in part from Defendants' fraudulent activities:

    a.    Royal Bank    No. 100038669    $39,698

## MIG Enterprises, Inc

57.    MIG Enterprises, Inc is a Pennsylvania Corporation that was created on or about March 21, 2006 with a principal place of business at 2801 Grant Avenue, Philadelphia, Pennsylvania. MIG Enterprises owns FurnitureXO.com, an Internet furniture store with a showroom also located at 2801 Grant Avenue, just adjacent to HCH's headquarters. Kolodech is

18

the CEO of MIG Enterprises, Inc. Between April and October 2006, MIG Enterprises received transfers of $436,000 from personal bank accounts held in the name of Kolodech and Yakobashvili. HCH paid MIG Enterprises over $101,000 between May 2006 through May 2007.

58.     MIG established the following bank accounts with funds at least in part from Defendants' fraudulent activities:

| | | | |
|---|---|---|---|
| a. | Bank of America | No. 3830600091/02285087 | $192,970 |
| b. | Citizens Bank | No. 6220643759 | $96,257 |

59.     Upon information and belief, there are other accounts in which Defendants have deposited proceeds derived from their fraud on Medicare.

## COUNT I (INJUNCTIVE RELIEF)

60.     The United States realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

61.     Among other illegal actions, Defendants violated 18 U.S.C. § 1347 by committing a health care offense, as defined in 18 U.S.C. § 24, by executing a scheme to defraud a health care benefit program, Medicare, in connection with the delivery of or payment for health care benefits, items or services.

62.     Defendants' fraud upon Medicare is a fraud against the United States and constitutes a continuing and substantial injury to the United States and its citizens.

63.     The United States brings this action to protect the Medicare program by restraining Defendants' unlawful conduct, and to prevent the transfer and dissipation of funds and assets under Defendants' control as ill-gotten gains resulting from their fraud upon Medicare.

64.     Upon a showing that Defendants are committing or about to commit a Federal health

19

care offense, the United States is entitled, pursuant to 18 U.S.C. § 1345, to a temporary restraining order and injunction, restraining all future fraudulent conduct and any other action that the Court deems just in order to prevent a continuing and substantial injury to the United States. The United States is also entitled to an injunction that bars Defendants from alienating, disposing, withdrawing, transferring, removing, dissipating or disposing of any property obtained as a result of a Federal healthcare offense.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America prays that this Court:

Issue a Temporary Restraining Order and Preliminary Injunction in this matter against all Defendants to include the Defendants' assets as listed in Exhibit A, and that an injunction be issued that orders Defendants, their agents, servants, employees, attorneys and all persons acting in concert and participation with them, including all corporations, partnerships and other business entities over which they exercise control, be enjoined as follows:

1. From making or conspiring to make any false claims to the Medicare program or any other health care benefit program, or otherwise from committing any Federal healthcare offense as defined in 18 U.S.C. § 24;

2. From falsifying patient records, to include, but not limited to (i) back dating service records or revocation requests, and/or (ii) submitting claims for levels of service that were never actually provided and/or (iii) billing Medicare at a reimbursement rate higher than allowed under federal law for the actual services provided and/or; (iv) creating false records of patient care that was not rendered and/or (v) charging for untrained and unqualified staff as if they were trained and qualified;

20

3.      From withdrawing or transferring any money or sums presently deposited, or held on

        behalf of any of the Defendants or entities controlled by them by any financial

        institution, trust fund or other financial agency, public or private, that are proceeds

        from false, fictitious or fraudulent claims made by HCH, or any moneys equivalent to

        those taken through false, fictitious or fraudulent claims;

4.      From transferring, selling, assigning, dissipating, concealing, encumbering, impairing

        or otherwise disposing of, in any manner, the assets of Defendants contained in the

        bank and brokerage accounts and safe deposit boxes listed in Exhibit A;

5.      Ordering Defendants to preserve all business, financial and accounting records,

        including any bank records, that detail HCH's business operations and any disposition

        of any payment that directly or indirectly arose from payment of money to any

        Defendant on behalf of Medicare;

6.      Ordering Defendants to preserve all medical records, including patient records, which

        relate to HCH's business operation and/or services for which claims were submitted

        to the Medicare program;

7.      Ordering Defendants to provide an accounting of all assets, within seven calendar

        days and to provide on a monthly basis suitable reports detailing their financial

        condition;

8.      Ordering Defendants to complete the Financial Disclosure Statement form provided

        to them by the United States within seven calendar days;

21

9.    For such other and further relief as the Court shall deem just and proper.

Respectfully,

_____
LAURIE MAGID
Acting United States Attorney

_____
VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

_____
COLIN M. CHERICO
ERIC D. GILL
Assistant United States Attorneys
615 Chestnut Street Suite 1250
Philadelphia PA 19106-4476
(215) 861-8786
(215) 861-8349 (Fax)

Dated:   September 30, 2008

## VERIFICATION

I, James Titcombe, am an agent of the Federal Bureau of Investigation assigned to the

investigation of this matter. I verify, under penalty of perjury, that the facts in this Verified

Complaint are true and correct to the best of my knowledge, and are based upon information

obtained by me during an investigation in my capacity as an agent of the Federal Bureau of

Investigation.

James Titcombe
Special Agent, Federal Bureau of Investigation

Dated: 9/30/2008

23

# Exhibit A

| Institution | Holder | Accounts | Date | Last Known Balance |
|---|---|---|---|---|
| Bank of America | ABBA Holdings, LLC | 383002588441 and 91000078923678 | 7/31/08 | $ 129,826 |
| Bank of America | Home Care Hospice, Inc | 004483034007 | 7/13/08 | $ 214,919 |
| Bank of America | M&A Properties, LLC | 9420208036 | 7/31/08 | $ 31,915 |
| Bank of America | MIG Enterprises, Inc | 003830600091 and 383002285087 | 7/31/08 | $ 192,970 |
| Citizens Bank | ABBA Holdings, LLC | 6216646757 | 6/30/08 | $ 88,255 |
| Citizens Bank | Home Care Hospice, Inc | 6216646641 and 6216646668 | 7/3/08 | $ 98,529 |
| Citizens Bank | Kolodech | 6214143278 | 6/19/08 | $ 12,709 |
| Citizens Bank | MIG Enterprises, Inc | 6220643759 | 6/30/08 | $ 96,257 |
| Citizens Bank | Pugman | 6219431018 | 7/3/08 | $ 38,686 |
| Citizens Bank | Yakobashvili | 6209271271 | 7/15/08 | $ 19,811 |
| Commerce Bank | ABBA Holdings, LLC | 609087688 | 8/19/08 | $ 121,433 |
| Commerce Bank | Home Care Hospice, Inc | 368965547 | 9/29/08 | $ 99,000 |
| Commerce Bank | Kolodech and Yakobshvili | 609087687 | 8/19/08 | $ 202,289 |
| Countrywide Bank | Ganetsky | 9201221414 | 6/30/08 | $ 91,147 |
| Countrywide Bank | Pugman | 9400389798 | 6/30/08 | $ 49,690 |
| Firstrust Bank | Kolodech and Yakobshvili | 168351030 | 7/11/08 | $ 191,644 |
| Firstrust Bank | Kolodech and Yakobshvili | Safety Deposit Box 401 and 404 - Southampton Branch | 7/11/08 | Unknown |
| Fulton Financial Corporation | Home Care Hospice, Inc | 99049414 | 12/5/07 | $ 97,000 |
| Fulton Financial Corporation | Kolodech | 4008207 | 10/26/09 | $ 56,815 |
| Fulton Financial Corporation | Yakobashvili | 4008206 | 10/26/07 | $ 113,630 |
| Fulton Financial Corporation | Yakobashvili | 4008205 | 10/26/07 | $ 113,630 |
| Fulton Financial Corporation | Yakobashvili | 4008208 | 10/26/07 | $ 56,815 |
| M&T Bank | ABBA Holdings, LLC | 15004216742525 | 7/31/08 | $ 100,105 |
| Merrill Lynch | ABBA Holdings, LLC | 890-02026 | 7/11/08 | $ 270,000 |
| Merrill Lynch | APLG Holdings, LLC | 89002024 | 6/30/08 | $ 2,619,729 |
| Merrill Lynch | Home Care Hospice, Inc | 89004006 | 6/30/08 | $ 1,418,176 |
| Merrill Lynch | Pugman and Ganetsky | 89014910/89013974 | 6/30/08 | $ 68,462 |
| PNC Bank | Kolodech and Yakobshvili | 31700242042 | 6/9/08 | $ 109,128 |
| Royal Bank | Home Care Hospice, Inc | 100051554 | 6/30/08 | $ 98,820 |
| Royal Bank | Mattax Properties LLC | 100038669 | 6/30/08 | $ 39,698 |
| Sovereign Bank | ABBA Holdings, LLC | 322040949 | 6/30/08 | $ 98,599 |
| Sovereign Bank | Home Care Hospice, Inc | 322040833 | 11/26/07 | $ 97,000 |
| Sovereign Bank | KP Grant Enterprises, LLC and KP Grant Enterprises, LP | 321113500 and 321113462 | 6/30/08 | $ 23,119 |
| UBS Financial Services | ABBA Holdings, LLC | JH-01387 | 7/31/08 | $ 725,402 |
| Ukrainian Self Reliance Federal Credit Union | APLG Holdings, LLC | 15712 | 6/19/08 | $ 86,249 |
| Wachovia | Home Care Hospice, Inc | 2000031248732 | 2/14/08 | $ 95,549 |
| Willow Financial | ABBA Holdings, LLC | 230007650 | 1/24/08 | $ 320,738 |
| Willow Financial | Ganetsky | 2300070731 | 7/11/08 | $ 88,989 |
| Willow Financial | Home Care Hospice, Inc | 230076519 | 12/3/07 | $ 97,000 |
| Willow Financial | Kolodech and Yakobshvili | 1401014145 | 8/12/08 | $ 87,272 |
| | | | | $ 8,561,002 |

Exhibit B: Flow of Medicare Funds Deposited into Home Care Hospice "Operating Account" to Personal and Business Accounts



MM=million, M=1,000; Numbers rounded to nearest 100 thousand or thousand; $ Amounts in boxes represent total "operating account" linked funds transferred



Exhibit C: Flow of Medicare Funds Deposited into Home Care Hospice "Operating Account" to Home Care Hospice Accounts